In re MERCEDES–BENZ ANTI-
TRUST LITIGATION.

No. 99–4311.

United States District Court,
D. New Jersey.

Aug. 9, 2001.

Lisa J. Rodriguez, Rodriguez & Richards, Haddonfield, NJ, for Liason.

Anthony J. Bolognese, Bolognese & Associates, Philadelphia, PA, Michael D. Hausfeld, Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Eugene A. Spector, Jeffrey J. Corrigan, Spector, Roseman & Kodroff, Philadelphia, PA, for plaintiffs.

Stephen N. Dermer, Lowenstein Sandler, Roseland, NJ, Peter A. Efros, Efros & Woopaty, Red Bank, NJ, Robert J. Kipnees, Greenbaum Rowe Smith Ravin Davis & Himmel, Woodbridge, NJ, Andrew P. Napolitano, Epstein Becker & Green, P.C., Newark, NJ, James I. Serota, Vinson & Elkins, New York City, Michael Shuster, White & Case, New York City, Michael S. Waters, Stephen F. Payerle, Carpenter, Bennett & Morrissey, Newark, NJ, Charles A. Newman, E. Perry Johnson, Bryan Cave, LLP, St. Louis, MO, Robert J. Dwyer, Elizabeth A. Bousquette, Bryan Cave, LLP, New York City, for defendant Mercedes–Benz USA, Inc.

Ronald B. Weisenberg, Vedder, Price, Kaufman & Kammholz, Livingston, NJ, John H. Eickemeyer, Vedder, Price, Kaufman & Kammholz, New York City, for defendant Sheft Kahn & Co, LLP.

James A. Moss, Stacy K. Rosenberg, Herrick, Feinstein, LLP, New York City, Newark, NJ, Steven M. Edwards, Nicholas W.C. Corson, Hogan & Hartson, New York City, for Mercedes–Benz Manhattan, Inc.

Thomas M. Madden, Hack, Piro, O'Day, Merklinger Wallace & McKenna, Florham Park, NJ, for defendant Beifus Motors.

### OPINION

WOLIN, District Judge.

This matter is opened before the Court upon the several motions of defendants,

Mercedes–Benz U.S.A., L.L.C., Mercedes–Benz of Manhattan, Sheft Kahn & Co., L.L.P., Beifus Motors, Inc. and the joint motion of all of the remaining defendant Mercedes–Benz dealers to dismiss the complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(6). The motions (referred to alternatively, *infra*, by the singular "motion") have been decided upon the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, the motions will be denied.

## BACKGROUND

This lawsuit was brought by several consumers purporting to be acting on behalf of themselves and similarly situated persons who purchased or leased Mercedes–Benz automobiles from dealers in New York City and its environs, including suburban counties in Connecticut, New York State, and New Jersey, from February 1992 through August 1999. The complaint states that these dealers constitute Mercedes–Benz's New York region. The complaint names as defendants all or substantially all of the dealerships in the region. It also names Mercedes–Benz U.S.A., the national distributor of Mercedes–Benz automobiles. Defendant Mercedes–Benz of Manhattan is a wholly-owned subsidiary of Mercedes–Benz U.S.A. The other dealerships are franchises, but have no corporate affiliation with Mercedes–Benz U.S.A.

The complaint purports to allege a horizontal and vertical price-fixing conspiracy, in violation of section one of the Sherman Act. It is alleged that the conspiracy was furthered by several "complimentary" means. The dealerships exchanged financial information, including pricing strategies and historical sales information. Plaintiffs claim that Mercedes–Benz U.S.A. and its accountant, defendant Sheft Kahn, compiled monthly and year-to-date analyses for each dealer stating, *inter alia*, the average price and gross profit realized by each dealer for each model of car sold. This information was shared by all of the defendants, allegedly for the purpose of policing compliance with the price-fixing conspiracy.

In addition, it is alleged, Sheft Kahn convened meetings of dealership representatives participating in the conspiracy. Plaintiffs claim that at these meetings defendants discussed the dealerships' financial reports and exchanged further pricing information in furtherance of the conspiracy. "Dealers were lectured about the importance of not competing against each other on the basis of price, and any dealer whose monthly reports indicated lower pricing and [lower] gross profit levels than the others was singled out and berated." Complaint at ¶ 35.

Plaintiffs claim that Mercedes–Benz U.S.A. "knew of and facilitated" these meetings, intending with all of the other defendants that the meetings further the goals of the conspiracy to restrict price competition among the dealers. *Id.* ¶ 34–35. Mercedes–Benz U.S.A. also allegedly communicated directly with dealers, directing them to not to compete on price in violation of the conspiracy and threatening to punish dealers who failed to comply. *Id.* ¶ 37.

Defendants move now to dismiss the complaint against them for failure to state a claim upon which relief may be granted. Pursuant to this Court's case management Orders, the dealer defendants have moved jointly. Separate movants are Mercedes–Benz U.S.A., the wholly-owned dealer Mercedes–Benz Manhattan, and Sheft Kahn. The defendant-dealer Beifus Motors has been permitted to submit a separate submission to the Court, upon its representation that its situation is not entirely congruent with the other dealers. Not surprisingly, the several briefs raise some

common issues, issues central to whether this matter should be permitted to proceed at all. Other issues are raised by and are relevant to only one or another of the parties. This Opinion will address the common issues first, and then those specific to only one or another of the parties.

## DISCUSSION

### 1. *The Rule 12(b)(6) Standard*

■ Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a complaint to be dismissed for failure to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all allegations in the complaint, and must provide the plaintiff with the benefit of all inferences that may be fairly drawn from the complaint. *See, e.g., Wilson v. Rackmill*, 878 F.2d 772, 775 (3d Cir.1989). A complaint cannot be dismissed unless the court is certain that no set of facts can be proved that would entitle plaintiff to relief. *See id.; Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). There is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply. *See MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.*, 62 F.3d 967, 976 (7th Cir.1995).

### 2. *Per Se Violation and Market Definition*

■ Defendants complain that plaintiffs have made no attempt to define either a geographic or product market in which defendants are alleged to have wrongfully conspired to interfere with competition. Defendants argue that this lack dooms the complaint. Plaintiffs respond that their allegations state a *per se* violation of the Sherman Act. Plaintiffs submit that where a *per se* violation is pled, as distinct from a violation subject to "rule of reason" analysis, no market definition is required. Plaintiffs are correct on both points.

■ The Court begins with black-letter law. Speaking generally, harm to competition in a particular market is the gravamen of a Sherman Act violation. "Some types of concerted activity, however, 'because of their pernicious effect on competition and lack of any redeeming virtue,' are treated as *per se* violations of section 1, without any inquiry into the harm such activity may have caused in the relevant market." *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir.1985) (quoting *Northern Pac. Rwy. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). Anti-competitive effect within the relevant market is "conclusively presumed" in a *per se* case. *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir.1998).

■ Defendants do not quibble that price-fixing is a *per se* antitrust violation. Dealer Defendants' Brief at 6 (citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)). Justice Douglas is often quoted:

> Price-fixing agreements may or may not be aimed at complete elimination of price competition. The group making those agreements may or may not have power to control the market. But the fact that the group cannot control the market prices does not necessarily mean

that the agreement as to prices has no utility to the members of the combination. The effectiveness of price-fixing agreements is dependent on many factors, such as competitive tactics, position in the industry, the formula underlying pricing policies. Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. The are all banned because of their actual or potential threat to the central nervous system of the economy.

*Socony–Vacuum*, 310 U.S. at 225–26 n. 59, 60 S.Ct. 811; *see also Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (horizontal price fixing "perhaps the paradigm of an unreasonable restraint of trade"); *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993) (upon proof of horizontal price-fixing conspiracy, no showing of impact on competition in relevant market required).

Defendants instead attack the proposition that plaintiffs have successfully pled a price-fixing conspiracy. Plaintiffs have alleged at most a mere exchange of information, defendants maintain. They argue that information exchanges, particularly in the vertical context (*i.e.* between the Mercedes–Benz U.S.A. and its dealers), are analyzed under the rule of reason. Defendants rely in part on *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999). In rule-of-reason cases, market definition is frequently a critical point of a plaintiff's case.

The Third Circuit's *Baby Food* opinion affirmed a district court's grant of summary judgment to defendants. The Court of Appeals found that plaintiffs' direct evidence would support only a finding that the defendants had exchanged information, not that they had taken concerted action in furtherance of a conspiracy to restrain trade. Plaintiffs' other evidence of an illegal agreement was circumstantial, primarily a history of parallel price movements between babyfood manufacturers.

Defendants argue that the *Baby Food* case shows that exchanges of pricing information cannot amount to a *per se* violation. This cannot win the day for them, however. First, defendants confuse the issue of the type of activity condemned by the Sherman Act with the issue of the type of evidence supporting a plaintiff's case that this activity took place. In the *Baby Food* case, at the summary judgment stage, plaintiffs' direct proofs only supported a finding of information exchange, not a prospective agreement to fix prices. Because price information may in some instances lead to pro-competitive effects, the Court of Appeals found that the rule of reason was the proper mode of analysis. 166 F.3d at 118 (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)).

Second, defendants' argument that price information exchanges cannot state a claim for price-fixing fails for the simple reason that the complaint and the reasonable inferences to be drawn therefrom allege substantially more than a simple exchange of information. On the contrary, a fair reading of the complaint alleges that the dealers and Mercedes–Benz U.S.A.'s accountant met to formulate prospective, coordinated pricing strategies.[1] It is plainly alleged that the information exchange permitted, and was intended to permit, fellow conspirators to identify ren-

1. "Sheft Kahn and certain New York Region MB Centers exchanged confidential information concerning pricing strategies in order to foster the goals of the conspiracy." Complaint ¶ 34.

egades from the price-fixing agreement. The complaint states that wayward dealers thus identified were berated at the meetings and threatened in direct communications from the national distributor, inferentially acting as a vertical conspirator with the disaffected dealer and as an co-conspirator-agent of the horizontal, dealer conspiracy.

■ Of course, the evidentiary fulcrum of the holding in the *Baby Food* case makes the actual result there less than instructive for this case. The courts have given a special gloss to the summary judgment standard in antitrust matters, "limit[ing] the range of permissible inferences from ambiguous evidence in a § 1 case." *Baby Food*, 166 F.3d at 124 (citing *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). To resist a summary judgment motion, the antitrust plaintiff must adduce evidence that would tend to exclude the possibility that competitors acted independently. *Id.*

In contrast, a 12(b)(6) motion such as this one requires the Court to draw all favorable inferences in favor of the complaint. Those inferences, not to mention the explicit allegations of the complaint, point to a conscious agreement to fix prices between horizontal competitors. It is fairly alleged that the information exchanged was not merely historical, but that the exchange of data also included future pricing plans. In particular, reference in the complaint to discussions of "pricing strategy" clearly suggests that the alleged conspirators were colluding with respect to future pricing and profitability decisions. To the same effect is the allegation that defendants were "lectured about the importance of not competing against each other on the basis of price...." Nor can the Court ignore the allegations that discounters deviating from

the alleged agreement were disciplined. The fair inference is that dealers who were not singled out for this treatment understood that the price of peace was participation in the conspiracy.

Defendants' reliance on *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir.1997), is not well-placed. *Queen City* concerned a tying arrangement between the franchiser, Pizza Hut, and its franchisees concerning the purchase of pizza dough and other ingredients. Tying cases are not, however, subject to *per se* analysis. "[A] particular tying arrangement may have procompetitive justifications, and it is thus inappropriate to condemn such an arrangement without considerable market analysis." *Data General Corp. v. Digidyne Corp.*, 473 U.S. 908, 105 S.Ct. 3534, 3534–35, 87 L.Ed.2d 657 (1985).

In *Queen City*, the Court of Appeals rejected the plaintiff's argument that the relevant market for section one purposes was Pizza Hut-approved dough and ingredients. 124 F.3d at 437–38. Defendants raise a straw argument, claiming that plaintiffs must rely on the proposition that Mercedes–Benz automobiles constitute a distinct market for section one purposes. Defendants argue that *Queen City* contradicts this single-brand market definition (which plaintiffs never actually raised). However, the *Queen City* panel actually found that plaintiffs' proposed market limitation to Pizza Hut dough was a function of the franchisees' contractual obligations under their agreement with the franchiser, Pizza Hut, rather than a distinct market for antitrust analysis. *Id.* at 438. Therefore, even had plaintiffs' case actually required a market definition limited to Mercedes–Benz automobiles, defendants' *Queen City* argument would have been beside the point.

Mercedes–Benz U.S.A.'s participation does not change the *per se* character of the allegations. It is true that the courts have been more willing to apply the rule of reason to agreements between manufacturers or suppliers and distributors below them in the chain of supply. Thus, in these so-called "vertical" relationships, non-price restraints are not necessarily subject to *per se* treatment because the accused restraints may actually enhance inter-brand competition. *See Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 724–25, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The parties have brought no case to the Court's attention that would extend this leniency to vertical, minimum resale price-fixing agreements. *But see State Oil Co. v. Khan,* 522 U.S. 3, 16, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (reaffirming, in *dictum,* that vertical, minimum price-fixing agreements remain subject to *per se* analysis); *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (vertical, resale price restraints illegal *per se* ).

■ Moreover, the law is settled that where an upstream supplier participates in a conspiracy involving horizontal competitors, it is proper to analyze the entire restraint as one of horizontal price-fixing. *Rossi,* 156 F.3d at 462 (collecting cases). "The common principle . . . is that a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition. . . ." *Id.* Thus, in *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966), the Supreme Court found that a group of horizontal competitors who induced the manufacturer to boycott sales to a price discounter constituted a horizontal group boycott. *See also Big Apple BMW, Inc. v. BMW of No. Am.,* *Inc.,* 974 F.2d 1358 (3d Cir.1992), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

For the foregoing reasons, the Court finds that plaintiffs have successfully pled a *per se* violation of section one. Under the liberal pleading standards of the Federal Rules, the allegations and the reasonable inferences to which they give rise sufficiently outline the illegal agreement, the "conscious commitment to a common scheme designed to achieve an unlawful objective," that the law requires to state this type of claim. *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). An unlawful agreement to fix prices is sufficiently clear from the pleading to state a claim for both horizontal and vertical price-fixing. The Court will not characterize these allegations as strong or weak, nor this motion as close or otherwise. The Court need hold only that the complaint cannot be dismissed at this stage of the litigation.

### 3. *Standing*

#### a. *Antitrust Injury*

Defendants claim that plaintiffs have failed to allege antitrust injury, because they have failed to claim that there was an actual reduction in marketwide competition or an adverse effect on the marketplace as a whole. Central to these arguments is defendants' repeated claim that the complaint must define the relevant product and geographic markets. Plaintiffs respond that market definition is not necessarily required where a *per se,* price fixing violation is alleged. Defendants reply that plaintiffs are attempting to exempt themselves from the requirement of showing antitrust injury. The Court believes that defendants have mis-stated both the law and plaintiffs' argument.

■ There are two discrete elements of pleading a private, federal, antitrust cause of action. Obviously, to show a violation of the Sherman Act, the plaintiff must show a contract, combination or conspiracy "in restraint of trade." 15 U.S.C. § 1. To establish standing for a private suit under section four of the Clayton Act, the plaintiff must also allege "antitrust injury," a term of art for considerations going to whether plaintiffs' injury is sufficiently linked to the predicate Sherman Act violation. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–10, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Even in *per se* cases, the plaintiff must allege antitrust injury. *Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 120 (3d Cir.2000).

■ The Supreme Court in *Associated General Contractors of Cal. Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535–46, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereinafter *"Associated General "*), set forth a detailed analysis for standing in private antitrust suits brought under section four of the Clayton Act, incorporating the concept of antitrust injury. The plaintiff must allege: (1) the causal connection between the antitrust violation and the harm to the plaintiff; (2) whether the plaintiff's alleged injury is of the type that the antitrust laws were intended to redress; (3) the directness of the injury; (4) the existence of more direct victims of the violation; and (5) the potential for duplicative recovery or complex apportionment of damages. Not only did *Associated General* synthesize a number of competing standing rules that had developed, but it introduced a more flexible, balancing approach to the standing analysis. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1166 (3d Cir.), *cert.*

*dismissed sub nom. Bessemer & Lake Erie R. Co. v. Republic Steel Corp.*, 510 U.S. 1021, 114 S.Ct. 625, 126 L.Ed.2d 589 (1993).

The Third Circuit has said that the question of antitrust injury is "akin to 'proximate cause' to determine whether a particular injury is too far removed from an alleged violation to warrant a section 4 remedy." *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964 (3d Cir. 1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). Plainly absent from the factors set forth in *Associated General* is any bright-line requirement that a particular geographic or product market be alleged.

Of course, defining the relevant market may be relevant to both whether an illegal conspiracy exists and to whether the plaintiff at bar has suffered the requisite antitrust injury. In a tying or monopolization case, determining the defendant's power in the market may be crucial in deciding whether the activity complained of actually would alter the competitive forces sufficiently to constitute a restraint of trade. Once it has been established that a restraint of trade exists, it may be necessary again to refer to the definition of the relevant market to determine whether the defendant's anti-competitive activity has harmed the plaintiff in a manner the antitrust laws were intended to prevent.

This does not, however, require the conclusion that a definition of the market is necessary with respect to both of the above-mentioned elements in every case. As has already been established, certain activities are so patently anti-competitive that the courts dispense with further evidence on the point. This obviates the need to determine the relevant market to find an illegal restraint of trade. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 223–24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

Plaintiffs do not, however, contrary to defendant's suggestion, maintain that they are excused from establishing antitrust injury by virtue of the fact that they have alleged a *per se* violation. Plaintiffs argue that where members of the consuming public pay prices inflated to supra-competitive levels by a price-fixing scheme between ostensibly competing dealers, antitrust injury is established. Market definition and market power, while necessary to show antitrust injury in other contexts, are irrelevant in this situation, plaintiffs contend.

 Defendants' arguments, and in particular their reliance on *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990), were considered and rejected by the Third Circuit in *Pace Electronics*, 213 F.3d 118. It is not true, as defendants maintain, that the Supreme Court's reference in *Atlantic Richfield*, to "a competition-*reducing* aspect or effect of the defendant's behavior," 495 U.S. at 344, 110 S.Ct. 1884 (emphasis in original), created a requirement that price-fixing victims allege or demonstrate an anti-competitive effect in a relevant market in order to establish antitrust injury to themselves. " *Pace Elecs.*, 213 F.3d at 124. The ultimate antitrust injury question is whether the plaintiffs' injury resulted from the defendants' anti-competitive conduct, not whether a particular market has been affected by such conduct. *Id.*

 There is no real dispute that plaintiffs have alleged a harm in the form of lost money causally connected to defendants' activities. The alleged conspirators intended that the plaintiff consumers be the target of their activities, and the directness of plaintiffs' injury and the existence of more direct victims are not seriously questioned. As the Supreme and lower courts have held for decades, the purpose of the antitrust laws is to protect competition. *E.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Where, as here, it is alleged that consumers paid a price higher than the price that would have been offered had the dealers been competing, the purpose of the antitrust laws is obviously thwarted. *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482–83, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 potentially offers redress") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979)).

The Court believes that the number of published opinions so holding has been limited only by the obviousness of the proposition. *See, e.g., Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 328 (5th Cir.1978); *In re Nine West Shoes Antitrust Litig.* 80 F.Supp.2d 181 (S.D.N.Y. 2000); *In re South Central States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 421 (M.D.La.1980). Although considering standing in the context of a claim for injunctive relief, the Third Circuit has said of supra-competitive overcharges that "[i]t is difficult to imagine a more formidable demonstration of antitrust injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir.2000) (supra–competitive price paid by drug consumers constituted antitrust injury for purposes of standing under section 16 of the Clayton Act).

Finally, as the *Pace Electronics* panel recently noted, requiring market definition and proof of market power to establish antitrust injury in all cases would undermine the presumption of anticompetitive effect in the context of *per se* antitrust violations. 213 F.3d at 123. Plainly, no such bright line requirement exists in the

case law. As the Supreme Court found in *McCready*, 457 U.S. at 484, 102 S.Ct. 2540, where the injury to the consumer is "inextricably intertwined with the injury the conspirator sought to inflict," standing under section four of the Clayton act is present. Plaintiffs allegations are sufficient to show that they were the "foreseeable and necessary victims" of defendant's alleged price-fixing conspiracy, *Warfarin*, 214 F.3d at 400, and antitrust injury is properly pled.

**b.** *The Illinois Brick–Indirect Purchaser Rule*

■ In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), the Supreme Court built upon its earlier decision in *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), to hold that only the direct purchaser from an antitrust violator could bring a private action. The rule is based upon prudential concerns. The High Court was concerned that permitting an action for treble damages under section four of the Clayton Act against entities remote in the chain of distribution from the plaintiff would overly burden such lawsuits with complexity and undermine their remedial value. Specifically, the *Illinois Brick* Court was concerned with problems of apportionment of the damages between different levels of the chain of distribution, the risk of multiple and/or inconsistent adjudications of liability against the manufacturer, and a diminution of the statutorily mandated incentives to bring private antitrust suits. 431 U.S. at 730–31, 745–47, 97 S.Ct. 2061.

The Third Circuit traced its application of the *Illinois Brick* rule in antitrust cases

in *McCarthy*, 80 F.3d at 842. The Court of Appeals has held that only grocers who purchased packaging products directly from the manufacturer (or its subsidiary) could raise a Clayton Act treble-damages claim against that manufacturer. *Mid–West Paper Prods. Co. v. Continental Gp., Inc.*, 596 F.2d 573 (3d Cir.1979). In *Merican, Inc. v. Caterpillar Tractor Co.*, non-authorized dealers alleged that Caterpillar was penalizing its authorized dealers who sold Caterpillar products to them. 713 F.2d 958 (3d Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984). Despite the fact that the non-authorized dealers were the direct objects of the alleged conspiracy, the Court of Appeals rejected standing for them under the *Illinois Brick*/indirect purchaser rule. *Id.* at 962.

Defendant Mercedes–Benz U.S.A. claims that plaintiffs Dynamic Orthopedic and Medical Products, Inc. ("Dynamic") and Oran G. Kirkpatrick are barred under the *Illinois Brick* rule because they leased their Mercedes–Benz automobiles through non-party Mercedes–Benz Credit Corporation ("MBCC").[2] Defendant's brief states that MBCC acted as "leasing agent for the dealers where [plaintiffs] shopped." Thus, defendant claims, these plaintiffs were indirect purchasers from the named defendants and are barred from prosecuting this action by *Illinois Brick*.

The Court rejects defendant's contention that the participation of MBCC in the transaction justifies dismissal of these plaintiffs' claims at this stage of the litigation. It is far from clear at this point what role MBCC played. Even the stipulated amendment (see *supra* note 2), states only that plaintiffs "utiliz[ed] MB Credit Corp.

---

**2.** Plaintiff Dynamic and the fact that it and Kirkpatrick leased their automobiles do not appear in the complaint as filed. The parties have stipulated that the relevant paragraphs should be amended for the purposes of this motion to include these facts, without altering the nature of the motion from a motion to dismiss for failure to state a claim.

as the leasing agent." This allegation stops well short of stating that MBCC ever took title to the automobile, or ever dealt with plaintiffs in the role of seller to consumer.

On the contrary, one natural reading of the complaint, as supplemented by defendant's characterization of the allegations regarding MBCC, is that MBCC was simply an agent of the dealers. Alternatively, as its name suggests, MBCC's role and technical title of "lessor" may, in reality, have been more in the nature of financing the transaction. Plaintiffs submit in their brief that they negotiated the price of the lease and placed their orders with the dealers at the dealers' place of business. Plaintiffs profess lack of knowledge regarding the relationship of MBCC and defendants, arguing that this information is within the control of defendants and thus should not be the basis for a motion to dismiss.

The Court does not believe that obtaining financing renders a purchaser an indirect purchaser for the purposes of *Illinois Brick*. A financier sells the use of its money, not the product alleged to be price-fixed. The source from which one obtains funds for a purchase does not attenuate the seller-to-buyer relationship, either as a matter of logic or commercial reality. None of the cases cited by defendant supports the proposition that a third party's extension of credit for a price-fixed transaction affects the standing of the purchaser to bring an action under the federal antitrust statutes. Of course, MBCC may have taken title to the automobiles to secure its collateral in the event of a default by lessee. The Court doubts that this fact would make MBCC the seller of the automobile, however, any more than a bank acquiring title under a residential mortgage is the seller vis-a-vis the new homeowner-mortgagor.

Alternatively, for the sake of argument, the Court will assume for the moment another possibility suggested by the pleading—that MBCC was acting as the agent of the defendant dealers. Here a second scenario emerges in which no indirect purchaser problem exists. Courts applying *Illinois Brick* have held that where an agent does not function as an independent economic entity in the chain of distribution, the purchaser is a direct purchaser directly from the principal. *See In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 505 (S.D.N.Y.1996) (question involves several considerations, including "whether the use of the agent constitutes a separate step in the vertical distribution of the ... product") (distinguishing *McCarthy*, 80 F.3d 842).

It is also well-established that the rationale of *Illinois Brick*'s bar to indirect purchaser suits does not apply where the supposed intermediary is controlled by one or the other of the parties. *See* 431 U.S. at 736 n. 16, 97 S.Ct. 2061. This exception applies where the consumer owns or controls the intermediary, *e.g., id.,* and where the seller owns or controls the more direct purchaser. *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir.1997) (*dictum*). Although the courts most often contemplate the application of this "owned or controlled" exception in the context of wholly owned subsidiaries or interlocking corporate directorates, *see, e.g., Mid–West Paper Prods.*, 596 F.2d at 577 n. 8, this Court sees no reason why the rationale would not apply where the control exists through the contractual relationship of agency.

In any event, it appears that, as the facts are presently alleged, the problems of complex apportionment and multiple adjudications are unlikely to be implicated here. Plaintiffs claim that they negotiated

the prices solely with the dealers. Assuming the truth of this allegation, the price charged by the leasing agent did not vary from the negotiated price. This leads to the inference that the supra-competitive prices were passed through MBCC unchanged. Moreover, the only intermediary postulated to date is MBCC, said to be a subsidiary of defendant Mercedes–Benz U.S.A. and unlikely to bring an action or seek to join this one against the defendants at bar. Consequently, the risk of multiple claimants and a depleted fund for recovery simply are not implicated here.

More to the point, it should be clear from the several hypotheses entered into above that not enough is known at this point to rule one way or the other regarding MBCC and defendant's *Illinois Brick* argument. It suffices to note that the involvement of MBCC as alleged in the pleading permits the inference of a number of factual situations in which the *Illinois Brick* rule would not operate. Certainly, determining whether a party acted as an agent or an independent entity for antitrust purposes involves several, interdependent considerations. *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031 n. 5 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979).

Obviously, when the facts are developed and a record exists upon which the Court may rule, defendants may renew their *Illinois Brick* argument. Whether the Third Circuit or this Court has or should recognize certain exceptions to the *Illinois Brick* rule in the form put forward by plaintiffs, will also abide such later motion practice. Because this matter must proceed in this Court regardless of the outcome of this particular argument, no prejudice can attach to defendants if that determination is not made now.

### 4. *Statute of Limitations and Fraudulent Concealment*

Defendants argue that any claim that accrued more than four years ago is barred by the statute of limitations of the antitrust statute, 15 U.S.C. § 15b. The issue is of substantial practical importance in this lawsuit. The class period is alleged to have begun in February 1992. Defendants seek to invoke the statute of limitations to bar any claim accruing before September 1995.

Plaintiffs, anticipating this argument, have alleged a reply to this defense in the complaint: that the statute of limitations was tolled by defendants' fraudulent concealment of their activities. Plaintiffs claim that they first may be charged with knowledge of the conspiracy and the damage they had suffered on August 30, 1999. This is the date on which an article appeared in the New York Times outlining the details of the alleged conspiracy. Prior to that, plaintiffs maintain, defendants affirmatively acted to conceal their price-fixing activity. In the alternative, plaintiffs argue that the defendants' wrongdoing was by its nature self-concealing and that no further affirmative acts of concealment need be pled to invoke the fraudulent concealment doctrine.

■ The Third Circuit has not definitely outlined the parameters of the fraudulent concealment doctrine in the antitrust context. In *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1178–79 (3d Cir.), *cert. dismissed sub nom. Bessemer & Lake Erie R Co. v. Republic Steel Corp.,* 510 U.S. 1021, 114 S.Ct. 625, 126 L.Ed.2d 589 (1993), the Court of Appeals cited with approval its own precedent in *Bohus v. Beloff,* 950 F.2d 919, 925–26 (3d Cir.1991), which set forth the elements of fraudulent concealment under Pennsylvania law. The *Lower Lake Erie* Court identified three factors necessary to estab-

lish a claim of fraudulent concealment: (1) an affirmative act of concealment; (2) which misleads or relaxes the plaintiff's inquiry, who (3) exercised due diligence in investigating his cause of action.

■ *Lower Lake Erie* only addressed the due diligence prong of the fraudulent concealment doctrine. However, district courts in this circuit have treated that opinion as the current state of the law on fraudulent concealment in antitrust matters. *E.g., In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 483 (W.D.Pa.1999). It is clear that the fraudulent concealment doctrine applies as a matter of federal common law to toll federal statutes of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

■ Of course the burden of establishing a fraudulent concealment reply to a defendant's statute of limitations defense rests squarely on the plaintiff. *Forbes v. Eagleson*, 228 F.3d 471, 486–87 (3d Cir. 2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 2551, 150 L.Ed.2d 718 (2001). Fraudulent concealment allegations are, moreover, subject to the requirement of particular pleading set forth in Federal Rule of Civil Procedure 9(b). *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F.Supp. 584, 598 (D.N.J.1996). On the other hand, Rule 9 does do not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control. *In re Craftmatic Secs. Litig.*, 890 F.2d 628, 645 (3d Cir.1989) ("courts have relaxed the rule when factual information is peculiarly within the defendant's knowledge or control").

■ Fraudulent concealment cases stress that plaintiff must show "active misleading" by defendants and "reasonable diligence" by plaintiffs in perceiving the injury to their rights. *Forbes,* 228 F.3d at 487. "[T]he tolling lasts only 'until the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action . . . .'" *Id.* (quoting *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1392 (3d Cir.1994)) (alteration in original). More generally, however, the doctrine must remain true to its equitable roots and its overarching rationale, that "sophisticated defrauders" not be permitted to profit by their own misconduct and an inflexible application of the statute of limitation. *Craftmatic,* 890 F.2d at 645.

a. *The "Active Misleading" Requirement*

Defendants cite the Fourth Circuit's opinion in *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.,* 71 F.3d 119, 122 (4th Cir.1995), to rebut plaintiffs' argument that the alleged price-fixing was a self-concealing conspiracy. However, *Marlinton* addressed the affirmative act requirement of the fraudulent concealment doctrine more generally. In fact, that opinion identified three different approaches employed by the courts to determine whether the first element of fraudulent concealment is present.

The first approach, frequently identified with the Second Circuit and *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1084 (2d Cir.), *cert. denied,* 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988), holds that the affirmative concealment element is satisfied where the antitrust violation is self-concealing. *Marlinton,* 71 F.3d at 122; *see, e.g., In re Nine West* 80 F.Supp.2d at 192. A second, "intermediate" standard, requires the plaintiff to prove a distinct, affirmative act of concealment, but the concealing act may have been in furtherance of the antitrust conspiracy itself. *Marlinton,* 71 F.3d at 122 (citing *Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1532 (5th Cir.1988)). The last

approach requires a showing of affirmative concealment of the plaintiff's claim through acts entirely extrinsic to the conspiracy. *Id.* (citing *Colorado v. Western Paving Constr. Co.*, 630 F.Supp. 206, 210 (D.Colo. 1986), *aff'd en banc by an equally divided court*, 841 F.2d 1025 (10th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988)).

One court has illustrated the self-concealing conspiracy concept with the following example. The passing off of a counterfeit vase as a valuable antique is fraud only if the victim does not know that the vase is a fake. Without concealment there is no tort. The fraud is inherently self-concealing. On the other hand, a conspiracy to steal an antique vase is not self-concealing; the victim will know that the vase is missing. Replacing the antique with a counterfeit may conceal the fact of the theft, but it does not make the theft self-concealing. *Hobson v. Wilson*, 737 F.2d 1, 33 n. 102 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

To pursue the hypothetical of the vase, it may be that replacing the stolen vase with a fake is necessary to the success of the conspiracy, perhaps to avoid immediate apprehension. The concealment would be in furtherance of the goals of the conspiracy, and represent an example of the second, "intermediate" approach listed in *Marlinton*. Lastly, an act of concealment extrinsic to the conspiracy might arise if, after the fact, a suspicious victim were provided with false documents attesting to the vase's authenticity.

 The Fourth Circuit adopted the middle course in *Marlinton*. It would not limit the fraudulent concealment doctrine to allegations of concealment extrinsic to the conspiracy. This Court agrees. There is nothing in the law of the Third Circuit that restricts equitable tolling to cases involving acts of concealment that are extrinsic to the underlying wrong. Acts of concealment that also further the incidental goals of the conspiracy also may shield the wrongdoer while the statute of limitations runs. *See Allan Constr.*, 851 F.2d at 1532. This Court sees no reason why an affirmative act of concealment performed as part of the conspiracy itself may not also supply the affirmative act required by the fraudulent concealment doctrine.

In fact, *Marlinton* is in accord with the substantial weight of the cases which explicitly or *sub silentio* follow this view. *See Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 505 (9th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *Allan Constr.* 851 F.2d at 1532; *Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1472–74 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Therefore, the Court holds that allegations that defendants actively concealed the alleged conspiracy will support plaintiffs' claim of fraudulent concealment regardless of any argument that those acts were extrinsic to or in furtherance of other goals of the conspiracy.

On the other hand, this Court cannot agree with the *Marlinton* panel that a price-fixing can never be an appropriate context for application of the self-concealing conspiracy doctrine. *Marlinton* found that an antitrust conspiracy could only "arguably" be truly self-concealing for purposes of the fraudulent concealment doctrine where the deception was an "essential element" of the antitrust violation or that the violation was "by its very nature" concealed. 71 F.3d at 123. "Ordinary price fixing," the Fourth Circuit held, did not qualify because, while frequently concealed, secrecy is not an element of the offense but "merely a method of hiding it." *Id.* at 123 n. 1.

Defendants argue that bid-rigging is the only type of antitrust conspiracy the courts have held to be self-concealing. This is not correct. Notwithstanding the Fourth Circuit, numerous courts have found that a price-fixing conspiracy is self-concealing. *In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 192 (S.D.N.Y.2000); *In re Infant Formula Antitrust Litig.*, 1992 WL 503465 at *2 (N.D.Fla.1992). Conversely, the courts have recognized that, in some instances, bid-rigging is not self-concealing. *Allan Constr. Co.*, 851 F.2d at 1530.

District courts in this Circuit have diverged. Some recognize the self-concealing conspiracy concept as sufficient to support a claim of fraudulent concealment. *Pennsylvania v. Milk Indus. Mgmt. Corp.*, 812 F.Supp. 500 (E.D.Pa.1992); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F.Supp. 271, 273–74 (E.D.Pa.1986). Others have required affirmative acts independent of the alleged conspiracy before invoking the doctrine. *Pennsylvania v. Lake Asphalt & Petroleum Co. of Pa.*, 610 F.Supp. 885, 888 (M.D.Pa.1985).

In fact, the self-concealing conspiracy concept has a pedigree dating to *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874) ("by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which is designed to prevent fraud the means by which it is made successful and secure"). The Fourth Circuit, in *Marlinton*, acknowledged the policy underpinning the Supreme Court's *Bailey* opinion. However, the Fourth Circuit left open only the hypothetical possibility of a self-concealing conspiracy, should one be found that complied with the rigors of that court's definition.

This Court believes that the Fourth Circuit's articulation of the self-concealing conspiracy concept is too circumscribed. It is not clear what type of antitrust conspiracy, if any, would surmount the logical hurdle raised by *Marlinton*. The panel itself, while purporting to leave open the possibility of a self-concealing antitrust conspiracy, cited only the example of wrongful electronic surveillance as an example of a self-concealing wrong. 71 F.3d at 123. One might opine that price-fixers work a self-concealing fraud by falsely implying that they are in competition with each other. *Allan Constr.*, 851 F.2d at 1531. That deception is still not inherent to the restraint of trade. Whether or not the purchaser knows that prices are fixed, the suppression of competition and the statutory wrong is complete with the transaction.

The *Marlinton* panel rejected the third, "extrinsic act" approach in part because of the difficulty of separating acts of concealment which are truly extrinsic to the conspiracy from those which are both concealing and which further part of the conspiracy's anti-competitive ends. This Court perceives a similar difficulty in distinguishing between a self-concealing conspiracy (even one so tightly circumscribed as *Marlinton*) and acts of concealment that also advance the cause of the conspirators, the so-called "intermediate" approach ultimately adopted by the Fourth Circuit. *See* 2 Areeda & Hovenkamp, *Antitrust Law* ¶ 320e at 235 (2d ed.2000) (surveying the case law to observe: "It thus appears that the line between active and passive concealment is very fine indeed.").

In fact, the practical import of *Marlinton* is to eliminate the self-concealing conspiracy concept from consideration in antitrust cases. Even bid rigging, conceded to be self-concealing by defendants, could be overt, assuming all potential bidders were members of the cartel and assuming the

bidders had no fear of antitrust liability. *See Allan Constr.*, 851 F.2d at 1530 (bid-rigging not always self-concealing). Like-wise, a generic, horizontal, price-fixing conspiracy (of which bid-rigging is actually only a sub-species) could operate in the open, assuming the conspiracy had suffi-cient monopoly power to prevent purchas-ers from going to competitors.

In the abstract, secrecy is not integral to either bid-rigging or price-fixing. *See In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1030 (N.D.Miss.1993). Secrecy may be necessary from a practical standpoint if a price-fixing or bid-rigging conspiracy is to succeed, but this does not mean that concealment is an essential element of the violation. Rather secrecy is only impor-tant to either type of antitrust violation "merely [as] a method of hiding it." *Mar-linton*, 71 F.3d at 123 n. 1.

The fact remains, however, that the rea-soning of *Bailey* remains sound and bind-ing on this Court, and that the self-con-cealing conspiracy concept is established in the antitrust case law. *See Areeda & Hovenkamp, supra* ¶ 320e at 234–35. If it is to have continued vitality, then the Fourth Circuit's formulation cannot be correct. It must include conspiracies that are concealed for reasons that promote the conspirators' wrongful ends, even though concealment may not be theoretically nec-essary to complete the underlying re-straint of trade. It may be, for example, that where a cartel does not control an entire market they will agree to conceal their price-fixing conspiracy to reduce the risk that purchasers will substitute other products for the price-fixed product. In such a case, secrecy is sufficiently "inter-twined" with the aims of the conspiracy that it should be considered self-conceal-ing. *In re Vitamins Antitrust Litig.*, 2000 WL 1475705, *2 (D.D.C. May 9, 2000)

(quoting *In re Catfish*, 826 F.Supp. at 1031).

This is consistent with the policies the fraudulent concealment doctrine is intend-ed to serve. Antitrust conspirators know that their activities are illegal and there-fore work to conceal their wrongdoing. *Allan Constr.*, 851 F.2d at 1531. The rule of *Bailey* was already old when Congress enacted the four-year statute of limitations in the Clayton Act. Congress could not have intended to exempt those who would "commit[ ] a fraud in a manner that it concealed itself." 88 U.S. (21 Wall.) at 349; *Marlinton*, 71 F.3d at 124.

■ As discussed, this Court will adopt the "intermediate" standard of *Marlinton*. Alleged affirmative acts of concealment will state a claim for fraudulent conceal-ment regardless of whether those acts are separate and apart from the acts of con-cealment involved in the antitrust viola-tion. 71 F.3d at 126. This Court will also recognize the self-concealing conspiracy concept. The Court will not, however, constrain that concept in the manner pre-scribed by the Fourth Circuit's *Marlinton* opinion. Instead, the Court will recognize as self-concealing those conspiracies in which concealment is so inter-twined with the conspiracy as a whole that the equita-ble foundations of the fraudulent conceal-ment doctrine require the limitations peri-od to be tolled.

■ There is but one place in the com-plaint at which an particularized allegation of an affirmative act of concealment ap-pears. At paragraph 35, plaintiffs allege: "Participants were strenuously urged in the meetings not to reveal to anyone the substance of the discussions, lest the price-fixing scheme be revealed." It is alleged elsewhere that Sheft Kahn was the protag-onist at these meetings and it is a fair inference that it was Sheft Kahn acting as agent for Mercedes Benz U.S.A. and the

conspiracy as a whole who "urged" the dealers to conceal the price-fixing enterprise.

It is a somewhat more extended inference, but one the Court is willing to draw in plaintiffs' favor on this motion to dismiss, that Sheft Kahn's adjurations to secrecy were implicitly backed with the threat of discipline. As noted, the complaint expressly states that dealers refusing to comply with the conspiracy's price-fixing were "singled out and berated" at the meetings and subject to threats from the national distributor. It is reasonable to assume at the pleading stage that commands not to reveal the conspiracy also carried whatever coercive force the conspiracy could muster as well.

Courts have found that similar allegations were sufficient to sustain a charge of fraudulent concealment. *Greenhaw v. Lubbock County Beverage Ass'n,* 721 F.2d 1019, 1029 (5th Cir.1983) ("secret agreements and covert price-setting sessions"), *overruled on other grounds, International Woodworkers of Am. v. Champion Int'l Corp.,* 790 F.2d 1174, 1181 (5th Cir.1986); *King & King Enters. v. Champlin Petroleum Co.,* 657 F.2d 1147, 1154 (10th Cir. 1981) (agreement and list of unreliable persons to whom conspiracy should not be revealed), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *In re Vitamins,* 2000 WL 1475705 at *2 (secret meetings); *Illinois v. Sperry Rand Corp.,* 237 F.Supp. 520, 523–24 (N.D.Ill.1965) (same). In fact, "Proof of fraudulent concealment is found with *any* evidence of efforts designed to keep price fixing activities secret." *In re Catfish,* 826 F.Supp. at 1030 (emphasis added).

Defendants may well believe that plaintiffs single allegation of concealment in paragraph 35 barely breaches their formidable statute of limitations defense. Nonetheless, applying with an excess of caution the lenient standards of the Third Circuit in evaluating a motion to dismiss, the Court finds that it will suffice. It is argued that defendants control access to facts that, if alleged, would bolster this claim. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (in antitrust cases "proof is largely in the hands of the alleged conspirators"). The urging of Sheft Kahn to maintain secrecy, for the reasons set forth above, counts as an affirmative act of concealment. As a co-conspirator, Sheft Kahn acted as the agent of all the other alleged conspirators, and the alleged affirmative act of concealment is chargeable to each of them. *See Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1493 (D.C.Cir.1989). The allegation of paragraph 35, like Mercutio's wound, is "not so deep as a well, nor so wide as a church door, but 'tis enough', 'twill serve.'" *William Shakespeare, Romeo & Juliet* act 3, sc. 1.

Defendants contend that the allegations of the complaint allege at most an agreement not to disclose and that nondisclosure cannot support a claim of fraudulent concealment outside of the context of a fiduciary relationship. It is true that, except for the passage quoted from paragraph 35, plaintiffs' fraudulent concealment allegations raise no specific, affirmative acts. There is reason to question whether, but for paragraph 35, plaintiffs have satisfied Rule 9's particularized pleading requirement.

The Court is satisfied, however, and will hold in the alternative, that plaintiffs have also successfully alleged a self-concealing conspiracy. Regardless of whether concealment is an essential element of price-fixing, secrecy is its natural lair. *See In re Catfish,* 826 F.Supp. at 1030 (price-fixing "an illegal endeavor, and public knowledge of its existence spoils the plan"). On the

facts as alleged, inter-brand competition, the avoidance of prosecution and even mere customer relations would require the alleged conspirators to conceal the fact that the prices of Mercedes–Benz automobiles had been fixed at supra-competitive prices.

It is fair to infer that the conspiracy in the form alleged by plaintiffs would not have worked at all had it been public knowledge. Indeed, the contrary inference would strain credulity. If, as alleged, the conspirators agreed between themselves or were coerced into not revealing the conspiracy, this agreement may have been sufficiently intertwined with the conspiracy as a whole as to be part and parcel of it. As such, the conspiracy was self-concealing. It would ill-serve the guiding principles of the fraudulent concealment doctrine to dismiss this possibility on the pleadings presently before the Court.

### b. *The Diligence Requirement*

Defendants also attack plaintiffs' fraudulent concealment claim on the diligence prong. Defendants argue that, if the allegations of a conspiracy were true, plaintiffs would have discovered it by exercising reasonable diligence. Defendants point to several points at which they contend plaintiffs should have been aware of the alleged wrongdoing. First, defendants claim that plaintiffs were placed on notice of their claims by the filing of the lawsuit presently captioned *Mercedes–Benz v. Coast Automotive Group, Ltd.*, Civ. No. 99–3121(AMW), claimed by defendants to have been originally filed in September 1998. This matter was pending before Judge Cooper in the Trenton vicinage of this district until it was transferred here in December 2000. Second, in their reply, defendants argue that plaintiffs would have had notice of the price-fixing scheme by comparison shopping between the allegedly conspiring dealers.

The Court can accept neither of these arguments in support of this motion. The issue is the classic one of objective reasonableness. As quoted above, fraudulent concealment will toll the limitations period only " 'until the plaintiff knows, or should reasonably be expected to know, the concealed facts supporting the cause of action ...' " *Forbes*, 228 F.3d at 487 (quoting *Oshiver*, 38 F.3d at 1392) (alteration in original). Moreover, "the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants." *In re Flat Glass*, 191 F.R.D. at 488.

It is apparent that any serious consideration of this issue would take the Court well outside the boundaries of the pleading and beyond that which is even arguably before the Court on this motion to dismiss. *In re Catfish*, 826 F.Supp. at 1031 (declining to rule on question of reasonable diligence on motion to dismiss). At a minimum, this issue will involve assessing the factual circumstances surrounding the accused purchasing transactions and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy. The arguments raised by defendants are not ones upon which the Court could base a dismissal of the complaint for failure to state a claim.

Even assuming the Court could take notice of the *Coast Automotive* action to assess the adequacy of plaintiffs' complaint, only by operation of a legal fiction could the filing of a private lawsuit by an unrelated party in a different vicinage put consumers on notice as a matter of law that a price-fixing conspiracy was afoot. No authority appears in defendants' briefs

to support so harsh a rule, and the Court declines to adopt one. *Cf. Conmar Corp.,* 858 F.2d at 504 (information in public records created issue of fact regarding notice to antitrust plaintiffs); *In re Beef Cattle Indus. Antitrust Litig.,* 600 F.2d 1148, 1171 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). In any event, even if the *Coast Automotive* suit was filed in 1998, at most it would only mean that the statute of limitations ceased to be tolled at that time. Of course, plaintiffs' complaint was filed approximately one year later, well within the four-year limitation period.

Nor can the Court accept defendants' argument that a reasonably diligent purchaser would have comparison shopped between more than one dealer and realized from that comparison that the dealers were engaged in price-fixing. It is far from clear that comparison shopping would have revealed anything of the kind. Plaintiffs do not claim that the conspirators were so crude as to fix the price of all of their automobiles at precisely the same price, or even that the dealers refused all attempts to negotiate. They allege only that the final prices were elevated to supra-competitive levels pursuant to an illegal agreement between the dealers to preserve their collective profit margins.

Plaintiffs allege that it was impossible by the exercise of reasonable diligence for them to have discovered the conspiracy before the New York Times article of August 1999. As discussed, plaintiffs claim that this is a result of affirmative acts of concealment by defendants. Beyond this it is impossible to go on the pleadings alone. It certainly follows as a logical matter that normal consumers exercising reasonable diligence in the circumstances might have no inkling that they had paid a supra-competitive price and no reason to inquire further until they read of similar accusations by others in the press. It is true, as the Court has observed elsewhere, that the complaint errs on the side of baldness in its allegations. However, the Court gives weight to the argument that the facts are uniquely in defendants' control and more comprehensive discovery of those facts will better sort out this issue.

Procedurally, this lawsuit is still in its infancy. The issue of tolling of the statute of limitations due to defendants' alleged fraudulent concealment is an equitable one. As such it is intimately bound up with the facts of the case. *In re Beef Cattle,* 600 F.2d at 1171 (constructive or actual notice for fraudulent concealment analysis involves factual issues). The Court will not now dismiss potentially time-barred claims in the complaint on the pleadings alone, confident that each of the issues discussed above will be revisited with a mature record later in the case.

### 5. *Miscellaneous Arguments*

Various defendants have raised arguments that may or may not apply to all of them, but which do not require extensive discussion. The Court will address them seriatim in this section.

■ Defendants argue that plaintiff Berger lacks standing in this matter because his employer supplied the funds for the purchase of the allegedly price-fixed Mercedes–Benz automobile. The reasonable inference to be drawn here is that Berger's employer provides an automobile to Berger as a perquisite of his position. As such, the money for the purchase is part of his compensation. Berger's injury would allegedly be that part of his compensation lost to the conspiracy's supra-competitive prices, instead of being paid to him (perhaps in the form of a yet more expensive automobile).

The Court has already observed that a plaintiff-purchaser who obtains the necessary funds on credit is nonetheless a purchaser for antitrust standing purposes. Obviously the same principle applies where the source of funds is the purchaser's employer. That the money may have been transferred directly from the employer to the defendant dealer does not necessarily change the true nature of the transaction. On the other hand, if, as the record is developed, it appears that the Berger's employer was the real purchaser-at-interest and thus the real victim of the antitrust injury alleged here, the Court anticipates that substitution of parties should prove no insurmountable obstacle.

■■■ Citing no legal authority, the dealer-defendants argue that the complaint is legally insufficient because it fails to specify when the "allegedly wrongful acts occurred" and because it fails to specify which of the dealer-defendants participated in the alleged conspiracy. The complaint names the purported lead plaintiffs and identifies from which dealer each of them purchased their automobiles. The Court is confident that this information is sufficient for defendants to determine the date upon which each individual plaintiff purchased from the alleged conspiracy. Such information will be readily obtained in discovery in any event. Thus, the complaint is not so vague as to inhibit any defense the parties may feel is available to them.

■■■ Defendants also complain that plaintiffs have not specified which of them actually participated in the conspiracy. Defendants claim that the language of the complaint suggests that not all of the named dealer-defendants participated in the Sheft Kahn meetings. The short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy. That a particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator. *In re Vitamins,* 2000 WL 1475705 at *3; *Pinney Dock & Transport Co. v. Penn Central Corp.,* 991 F.Supp. 908, 911 (N.D.Ohio 1998) (citing *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)), *aff'd,* 196 F.3d 617 (6th Cir.1999). Should any defendant be in a position to object on the merits to its inclusion in this action, it will be permitted to do so at the appropriate time.

Finally, with respect to both of the foregoing arguments, the Court must recognize that the complaint was drafted to state a class action. Of course, the Court has not at this point ruled that this case should proceed as a class action nor has it certified a class. However, given the apparent lack of prejudice to the defendants, the Court will excuse some lack of specificity given that plaintiffs theory of the case includes a large number of transactions over a period of many years in violation of the federal antitrust laws.

Defendant Beifus Motors, Inc. argues that it cannot be held liable for plaintiffs' claims because it has not been a Mercedes–Benz dealer since 1997. Beifus Motors argues, moreover, that service of process upon it was defective because "Beifus Motors, Inc. as a Mercedes–Benz dealership" no longer exists. Both of these arguments are without merit.

■■■ Accepting for the sake of argument that Beifus Motors no longer does business as a Mercedes–Benz dealership, there is not even a claim that Beifus Motors no longer exists as a valid legal entity. On the contrary, according to plaintiffs' affidavit, Beifus Motors continues to exist as a valid New Jersey corporation. Of course, Beifus Motors may have lost its

franchise. The Court sees no reason, however, why Beifus Motors or its successors would lose its potential liability for acts taken during the class period when it operated as a Mercedes–Benz dealer. Certainly defendant has provided no legal authority for such a proposition.

 For the same reason, Beifus Motors' service of process argument must fail too. Again the Court is at a loss to understand why an entity's possession or lack thereof of a particular franchise would make a difference to whether that entity can be served with process. Plaintiffs aver that they served the corporation in the manner provided by law. Beifus Motors does not dispute that its agents actually received the complaint or that they have notice of the action against the corporation. Here too, Beifus Motors cites no legal authority explaining why this was not sufficient.

### CONCLUSION

The several defendants' separate motions for dismissal have resulted in a multiplicity of arguments. Those worthy of extended discussion have been dealt with above. The parties are assured that all of the arguments presented have received the due consideration of the Court even though all have not been directly addressed in this Opinion. None justify the relief sought in the pending motions. For the foregoing reasons, all of the pending motions to dismiss will be denied.

An appropriate Order is attached.

### *ORDER*

In accordance with the Court's Opinion filed herewith,

It is on this 9th day of August, 2001

ORDERED that the motions of defendants, Mercedes–Benz U.S.A., L.L.C., Mercedes–Benz of Manhattan, Sheft Kahn

& Co., L.L.P., Beifus Motors, Inc. and the joint motion of all of the remaining defendant Mercedes–Benz dealers to dismiss the complaint against them pursuant to Federal Rule of Civil Procedure 12(b)(6) (which comprise all of the motions to dismiss presently pending before the Court) are denied.