**K & R LEASING CORPORATION,**
**Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,**
**OLDSMOBILE DIVISION, Defendant.**

**No. 80 C 4787.**

United States District Court,
N.D. Illinois, E.D.

Nov. 9, 1982.

10. 15 n., 9.

Donald Klein, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, Peggy A. Hillman, Michael H. Slutsky, Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., for plaintiff K & R.

Daniel W. Vittum, Jr., Donald W. Rupert, Kirkland & Ellis, Chicago, Ill., Otis M. Smith, Burton Ansell, Detroit, Mich., for defendant Gen. Motors Corp., Olds. Div.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This case, involving federal antitrust law and state tort law, was transferred to this court from the United States District Court for the Southern District of New York. It is now before the court on defendant's motion to dismiss the Second Amended Complaint. For the reasons stated below, defendant's motion is granted.

The plaintiff in this action is K & R Leasing Corporation, a New York corporation headquartered in New York. The defendant is General Motors Corporation, Oldsmobile Division. The allegations of the Second Amended Complaint, which are taken as true for purposes of this motion, include the following. GM has agreed with its overseas dealers to protect them from intrabrand competition. K & R's business includes purchasing GM automobiles in this country and exporting them overseas, "to be purchased by customers who do not wish to purchase such automobile [*sic*] from the overseas dealers of the Defendant." GM "seeks to protect its overseas dealers from such intra-brand competition," and for this reason engaged in the particular acts complained of in this suit. (Second Amended Complaint, ¶ 14.)

In February 1980, through Continental Car and Truck Leasing, Inc. of Rosemont, Illinois, K & R ordered 50 Oldsmobile Cutlass Cruisers from Hejhal Olds of Villa Park, Illinois, at a price of $395,000. GM accepted this order and promised delivery by mid-April 1980. When it learned of K & R's involvement and that K & R intended to ship the cars overseas, GM cancelled the order.

Count I of the Second Amended Complaint seeks relief under a theory of tortious interference with contractual relations. K & R alleges that GM cancelled the order precisely because it wished to disrupt K & R's business relations and existing contracts. K & R prays $15,000 for lost commissions on the 50 Oldsmobiles, as well as $250,000 for loss of goodwill, reputation, and further business.

Count II seeks relief under Sections 1 and 2 of the Sherman Act, via Section 4 of the Clayton Act. K & R alleges that GM's protection of its overseas dealers deprives K & R and others engaged in its business of income from overseas sales, and that this protection restrains competition as to the ultimate purchase price, optional features and customer choice of models. K & R sums up with an allegation the court is not bound to accept as true for purposes of this motion: "The conduct of the Defendant as described herein was in violation of Title 15 U.S.Code §§ 1 and 2 inasmuch as it was not a permissible vertical restriction justifiable under the applicable rule of reason." (Second Amended Complaint, ¶ 17.) K & R seeks the same relief as under Count I,

except that it asks for treble damages and also attorney's fees.[1]

## THE ANTITRUST CLAIM

K & R alleges that GM is guilty of illegal vertical non-price restraints on the overseas distribution of its automobiles. It will be helpful at the outset to discuss briefly some aspects of vertical restraints.

■ Vertical non-price restraints are not per se illegal; instead, they are subject to the Rule of Reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). This holding recognizes that vertical restraints may enhance interbrand competition. For instance, dealers may be reluctant to devote resources to brand advertising if nearby dealers in the same brand can take a free ride on those expenditures. By placing territorial or other restraints on dealers, a manufacturer can assure them that they will reap the benefits of their interbrand competitive efforts. Application of the Rule of Reason to vertical non-price restraints thus has been interpreted as a balancing of the benefit to interbrand competition against the detriment to intrabrand competition. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 8 (1981).

It should be noted that whether vertical restrictions are condemned or approved under the Rule of Reason, there usually will be an incentive for an unauthorized dealer to circumvent the restrictions. Legal vertical restrictions are justified by the authorized dealers' vulnerability to free riding on their promotional and service expenditures. Since the free rider, unburdened by such expenses, can undersell the authorized dealers and still exceed the competitive profit, its incentive to circumvent the restrictions is great. Illegal vertical restrictions allow authorized distributors to extract monopoly profits. Here the incentive lies in the unauthorized dealer's opportunity to sell under the monopoly price, but still above the competitive price. In both cases the unauthorized dealer collects excess profits in relation to its investment and expenses. In the case of legal vertical restrictions, its excess profits are harmful free rider profits. In the case of illegal vertical restrictions, its excess profits may be helpful, because they tend to bid down the monopoly price charged by the authorized dealers. Another way of stating *GTE Sylvania,* then, is to say that, in this case, GM may protect its overseas dealers from intrabrand competition if that intrabrand competition consists of free riding on the promotional and service efforts of the authorized dealers. GM may not protect its overseas dealers from intrabrand competition if such protection in fact guarantees monopoly profits for the authorized dealers.

GM attacks K & R's antitrust claim on three grounds. First, relying on *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), GM asserts that K & R cannot state a claim because it is at best an indirect purchaser from GM. Second, GM challenges K & R's standing under *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163, 1168 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60 L.Ed.2d 242 (1979). Third, GM contends that K & R's allegations are insufficient to make out an antitrust violation on GM's part. This third argument convinces the court to dismiss K & R's claim.

*Illinois Brick*

■ In *Illinois Brick* the State of Illinois and several Illinois municipal bodies alleged

---

1. In its brief on this motion, K & R presents copies of some internal GM memoranda, presumably obtained during discovery. These documents, more in the nature of evidence than of demonstrative exhibits, are intended to rebut portions of GM's argument by showing that GM cancelled the order when it learned of K & R's involvement and its plans to export the cars. The memoranda reveal that another Oldsmobile dealer was approached before Hejhal Olds, but that the first dealer refused to participate in the plan. The memoranda also detail K & R's and Continental's attempt to conceal K & R's involvement and the autos' intended destination. K & R does not appear to dispute the truth of the various statements contained in the memoranda. The court does not consider these documents in determining the legal sufficiency of the allegations of K & R's Second Amended Complaint.

that brick manufacturers had fixed prices. Although the plaintiffs had not purchased directly from the defendant manufacturers, they reasoned that the intermediate distributors and contractors had passed the manufacturers' overcharges on to the plaintiffs, who were the ultimate purchasers. Fearing problems of double recovery and extremely complicated damage proofs, the Supreme Court held that only those who have purchased directly from price fixers can state a claim to recover the overcharge. 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707.

GM correctly points out that courts have not limited *Illinois Brick* to cases in which an indirect purchaser seeks to recover a passed-on overcharge. In *Parkview Markets, Inc. v. Kroger Co.,* [1978–2] Trade Cases (CCH) ¶ 62,373 at 76,202 (S.D.Ohio 1978), it was alleged that antitrust violations by a retail grocery chain injured the retail business of one plaintiff. A wholesaler supplying the injured retailer also sued, on the theory that harm to its retailer's business harmed its own wholesale business, but the court held that this claim was barred by the principles of *Illinois Brick.* In *Gas-A-Tron of Arizona v. American Oil Co.,* [1977–2] Trade Cases (CCH) ¶ 61,789 at 73,246 (D.Ariz.1977), gasoline retailers sued, alleging that refiners had failed to supply the plaintiffs' suppliers with sufficient oil products, thereby limiting the amount the suppliers could sell to the plaintiffs. This claim too was held to be barred by the principles of *Illinois Brick.*

Although *Illinois Brick* has been invoked to bar claims by indirect purchasers in contexts other than that of passed-on overcharges, *Illinois Brick* is not a blanket pro-

hibition of recovery by those who are not direct purchasers. *Cf. Strax, v. Commodity Exchange, Inc.,* 524 F.Supp. 936, 939–40 (S.D.N.Y.1981) (direct-purchaser requirement not applied in context of commodity exchange, where direct purchasers difficult to identify). The *Gas-A-Tron* case, cited by GM, did allow plaintiffs to pursue their claim against defendants for preventing an intermediate jobber from selling to them.[2] Application of *Illinois Brick* may be inappropriate particularly in vertical restraint cases, in which the gist of the matter often is that the defendant would not sell to the plaintiff, who then either bought from others lower on the chain of distribution, or was unable to buy at all.[3] In *Davis-Watkins Co. v. Service Merchandise Co.,* 500 F.Supp. 1244 (M.D.Tenn.1980), Service Merchandise bought from another distributor after Davis-Watkins refused to sell to it; the court allowed Service Merchandise to bring an antitrust counterclaim against Davis-Watkins without discussing *Illinois Brick.* See also *Balogh's of Coral Gables, Inc. v. Getz,* 510 F.Supp. 741 (S.D.Fla.1981) (defendant refused to sell to plaintiff). One concern motivating the Court in *Illinois Brick* was the fear that indirect purchasers might lack the incentive to enforce the antitrust laws, while allowing them to sue might dilute the incentive of direct purchasers. 431 U.S. at 746–47, 97 S.Ct. at 2074–75. In vertical restraint cases, direct purchasers very often may be especially poor antitrust enforcers.

The best enforcer of the antitrust laws in cases like the present one probably is the party organizing the unauthorized distribu-

**2.** The parties have disagreed over how *Gas-A-Tron* should be read. The court agrees with K & R's reading.

**3.** Challenges to vertical restrictions can come from at least two types of plaintiffs: unauthorized dealers who wish to deal in the goods subject to the restrictions, and authorized dealers who wish to deal outside their authorized territory. The latter type of plaintiff often will be a direct purchaser. *GTE Sylvania* involved such a direct purchaser. Continental T.V. was authorized to sell from a San Francisco location only, but it sought authorization to sell

from a Sacramento store as well. When this authorization was denied, it prepared to transfer some of its inventory to Sacramento for sale from an unauthorized location. Relations between Continental and Sylvania broke down, and Sylvania terminated Continental's dealership. That plaintiffs who are authorized dealers often will be direct purchasers is not a convincing reason for enforcing a direct-purchaser requirement where unauthorized dealers, who often cannot be direct purchasers, wish to challenge vertical restrictions.

tion.[4] That party may be reluctant to purchase directly from the manufacturer. Often the principal actor will interpose one or more parties, trying to deceive the manufacturer as to the ultimate destination of the goods. How much of the excess profits the principal party will have to share with these and other necessary parties may depend upon how many of them are in on the deception. In the present case, for instance, K & R[5] placed its order through Continental Car and Truck Leasing, Inc. If Continental was unaware of K & R's true plans for the cars, then Continental presumably would charge K & R its normal commission, having no reason to believe it could charge a higher price. If, on the other hand, Continental knew that K & R was going to reap excess profits by exporting the cars, then Continental may well have demanded some share of these profits above its normal commission. The same would be true of Hejhal Olds. If it knew that the cars were going to overseas, then it also might have demanded a share of the excess profits above its usual commission.

Pretty clearly, there is no reason to think that the direct purchaser, who may be a passive or even an unwitting participant in the unauthorized distribution, will have the greatest incentive to enforce the antitrust laws.[6] It may be, as the law develops, that a direct-purchaser requirement will be applied to vertical restraint cases, since certainty and avoidance of double recovery may be considered more important than finding the most efficient antitrust enforcer in every case. At this point, however, the court cannot say that *Illinois Brick* bars K & R's suit.

**4.** This party has the expertise and the incentive to orchestrate a plan for unauthorized competition. On the other hand, this party, like all the participants in the unauthorized distribution, may prefer not to challenge the restrictions as long as its unauthorized dealing is undetected or tolerated. Only, perhaps, when the manufacturer takes steps to prevent the competition will the unauthorized competitors have an incentive to bring an antitrust suit. This situation should be distinguished from that of a party wishing to become an authorized dealer. (K & R has alleged no such desire.)

### Standing

■ Related to the *Illinois Brick* issue is GM's assertion that K & R lacks antitrust standing. The above discussion of *Illinois Brick's* direct-purchaser rule as applied to this case should suggest why the court cannot dismiss K & R's claim on this ground. For all that appears on the pleadings, K & R very probably was the prime mover in this attempt to defy GM's vertical restraints. If so, K & R truly is the proper party to litigate this dispute. The court therefore cannot, at this stage of the litigation, hold that K & R does not have standing in this case.

### Legal Sufficiency of K & R's Allegations

Having rejected GM's *Illinois Brick* and standing arguments, the court addresses GM's third challenge to the Second Amended Complaint. The court agrees with GM that K & R fails to allege an antitrust violation by GM.

K & R's first complaint contained no antitrust count. Its Amended Complaint did present an antitrust count. In addition to relatively detailed allegations regarding the order and cancellation of the 50 cars, the Amended Complaint included three substantive paragraphs relating to GM's alleged antitrust violation:

11. Defendant's failure and refusal to make delivery as stated in paragraph 7 above occurred after Defendant received knowledge or information to the effect that the Oldsmobile Cutlass Cruisers were destined for overseas delivery.

12. Defendant failed and refused to make delivery in order to try to protect its overseas dealers from intra-brand competition from Plaintiff.

**5.** It fairly can be inferred from K & R's allegations, especially for purposes of a 12(b)(6) motion, that K & R was a principal in the exporting operation.

**6.** According to the documents submitted with K & R's brief on this motion, Hejhal Olds, the direct purchaser from GM, was approached by the other participants only after another Olds dealer had declined to participate.

13. The conduct of the Defendant as described herein was in violation of Title 15 U.S.Code §§ 1 and 2 inasmuch as it was not a permissible vertical restriction justifiable under the applicable rule of reason.

On March 17, 1982 the court dismissed the Amended Complaint for failure to state a cause of action.

On April 12 the court granted K & R leave to file the Second Amended Complaint, the subject of this motion. In addition to allegations relating to the order for 50 cars, Count II of the Second Amended Complaint contains the following substantive allegations relating to GM's alleged antitrust violation:

14. Plaintiff's business includes the export of new automobiles overseas to enable them to be purchased by customers who do not wish to purchase such authomobile [*sic*] from the overseas dealers of the Defendant. As such, Plaintiff is in competition with Defendant's overseas dealers. As the result of contracts, combinations or conspiracies between Defendant and its overseas dealers, Defendant seeks to protect its overseas dealers from such intra-brand competition.

15. Defendant's cancellation of the order and refusal to make delivery as stated in paragraph 7 above was for the purpose and with the effect of protecting its overseas dealers from intra-brand competition, in furtherance of the contracts, combinations and conspiracies referred to in paragraph 14.

16. The protection of Defendant's overseas dealers from intra-brand competition not only deprives Plaintiff and those similarly situated of business, income and commissions resulting from competition with Defendant's overseas dealers but also restrains competition as to the ultimate purchase price, optional features and customer choice of the models of Defendant's vehicles which can be sold overseas.

17. The conduct of the Defendant as described herein was in violation of Title 15, U.S.Code §§ 1 and 2 inasmuch as it was not a permissible vertical restriction justifiable under the applicable rule of reason.

K & R's allegation of a Section 2 violation is especially easy to dispose of. In pertinent part, Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony ...

■ Here K & R has made no allegations relating to market share, to the possibility that any kind of monopoly could be established, or to intent on anyone's part to establish a monopoly. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); 1 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 3.03[1][b] (Desk ed. 1982). K & R's Section 2 cases are distinguishable. In *Blankenship v. Herzfeld,* 661 F.2d 840 (10th Cir.1981), the plaintiffs alleged a per se illegal horizontal restraint masquerading as a vertical restraint. *Id.* at 844. The court stated that to prove a Section 2 violation, the plaintiff would have to prove that the defendant distributors monopolized some appreciable area of commerce. *Id.* at 847. In *California Steel Tube v. Kaiser Steel Corporation,* 650 F.2d 1001 (9th Cir. 1981), an attempt at industry-wide monopoly was charged, including predatory practices and a dangerous probability of success. It is apparent that K & R has not really attempted to bring its allegations within the scope of Section 2; the court therefore holds that K & R has failed to state a claim against GM under Section 2 of the Sherman Act.

■ K & R does come closer to alleging a Section 1 violation, but here too the court must hold that K & R does not state a claim. K & R recognizes that vertical restraints call for Rule of Reason analysis, and it alleges that GM's conduct is not justifiable under this standard. Apart from this conclusory allegation, K & R must ar-

ticulate some reason why the restraints are unreasonable.

K & R does not allege any detrimental effect on interbrand competition, but instead stakes its claim solely on allegations of restricted intrabrand competition. Even these allegations do not amount to much. They boil down to three propositions:

1) GM has authorized overseas dealers;

2) GM protects its authorized overseas dealers from unauthorized dealers of GM cars; and

3) GM thus eliminates intrabrand competition by unauthorized dealers.

This is axiomatic. By definition, vertical restraints restrict intrabrand competition. Thus, K & R's allegations merely identify a vertical restriction; they offer no clue as to whether the vertical restriction is of the permissible sort or of the impermissible sort. K & R does not.allege, for instance, that GM has impermissibly few authorized dealers, that GM refuses to authorize those who wish to be authorized dealers, or that intrabrand competition among authorized dealers is insufficient to meet the needs of the public. There is no suggestion that K & R wishes to become an authorized overseas dealer.

The Court of Appeals recently has stated, in affirming a grant of summary judgment against an antitrust plaintiff: .

> Now there is a sense in which eliminating even a single competitor reduces competition. But it is not the sense that is relevant in deciding whether the antitrust laws have been violated. Those laws, we have been told by the Supreme Court repeatedly in recent years, are designed to protect the consumer interest in competition. See, e.g., *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979). The consumer does not care how many sellers of a particular good or service there are; he cares only that there be enough to assure him a competitive price and quality. It thus would not be enough to show that Crum & Forster excluded Getzoff be-

cause Paris wanted it to.... No inference could be drawn that the result of excluding Getzoff under such circumstances would be to raise the price, or diminish the quality, of product liability insurance to the ladder industry.

*Products Liability Insurance Agency, Inc. v. Crum & Forster Insurance Companies*, 682 F.2d 660, 663–64 (7th Cir.1982).

At the pleading stage relevant facts may not yet be available, but the plaintiff at least should be expected to articulate a correct legal theory of recovery. 2 P. Areeda & D. Turner, *Antitrust Law* § 317(e) at 78–84 (1980). In this case K & R attempts to proceed under an incorrect theory of antitrust law. It is not sufficient under the Rule of Reason to identify a vertical restraint and to allege, without more, that it excludes intrabrand competition by the plaintiff. 682 F.2d 660; *Balogh's of Coral Gables, Inc. v. Getz*, 510 F.Supp. 741 (S.D. Fla.1981) (granting motion to dismiss for failure properly to allege public injury under the Rule of Reason). K & R's pleading is not saved by the indirect allegation that there are others "similarly situated."

The sparse allegations of K & R's Second Amended Complaint do not state a cause of action under the federal antitrust laws.

## TORTIOUS INTERFERENCE WITH CONTRACT

■ K & R's Count I also fails to state a claim upon which relief can be granted.[7] This count purports to state a claim under the Illinois law of tortious interference with contract. An important element of a claim for tortious interference with contract is that the defendant must have acted wrongfully or improperly. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 298 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); Restatement (Second) of Torts §§ 766, 766A, 767 (1979). Some statements of the elements of this tort do not explicitly mention a requirement of wrongful or improper conduct. *E.g., United States Trotting Association v. Chicago Downs Association*, 665 F.2d 781, 791 (7th

---

7. K&R alleges that its state law claim is within     the court's diversity jurisdiction.

Cir.1981). In such cases, the court believes, this element is implied in the concepts of interference and expectancy. This proposition is illustrated amply by a statement of the Illinois Appellate Court:

> The tort action for interference developed at an early date to give recognition to the principle that a person's business is property which is entitled to protection from harm by another who is not acting in the exercise of some right such as the right to compete for business. Annot., 9 A.L.R.2d 228, sec. 2.

> The theory of the tort of interference, it is said, is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others; that if acts of which complaint is made do not rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men similarly situated, the ensuing loss should be redressed; and that the line of demarcation between permissible behavior and interference reflects the ethical standards of the community. (45 Am. Jur.2d, Interference sec. 1.) The elements which establish a prima facie tortious interference are the existence of a valid business relationship (not necessarily evidenced by an enforceable-contract) or expectancy; knowledge of the relationship or expectancy on the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. The interest protected is the reasonable expectation of economic advantage. *Id.* sec. 50.

> . . . .

> The counterclaim adequately states a cause of action, we believe, for interference with Jerome's utilization of the property of which he was beneficial owner under the trust. Our review of the counterclaim's recital of refusals to issue applications, misstatements about availability of the property, threats concerning utilities, and other patent abuses of public office causes us to find little appeal in the argument that no wrongful conduct is alleged, that the conduct described was justified or privileged, or that the allegations are merely conclusions or conjecture.

*City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill.App.3d 359, 362–63, 300 N.E.2d 331 (3d Dist.1973).

■ Count I alleges that GM declined to sell its autos when it learned that they had been ordered on K & R's behalf and that K & R would export them. No case cited by K & R suggests that a unilateral decision not to sell could constitute improper or wrongful conduct. The improper conduct identified by K & R's cases was the publishing of defamatory statements, *Crinkley v. Dow Jones & Co.,* 67 Ill.App.3d 869, 24 Ill.Dec. 573, 385 N.E.2d 714 (1st Dist.1979), and knowingly hiring an employee in contravention of the employee's covenant not to compete with a previous employer, *Gorman Publishing Co. v. Stillman,* 516 F.Supp. 98 (N.D.Ill.1980). In other cited cases plaintiffs alleged misuse of corporate powers, *Panter v. Marshall Field & Co.,* 646 F.2d 271; misuse of governmental powers, *Parkway Bank & Trust v. City of Darien,* 43 Ill.App.3d 400, 2 Ill.Dec. 234, 357 N.E.2d 211 (2d Dist.1976); and an association's threat to exclude members who dealt with the counterclaim plaintiff, *United States Trotting Association v. Chicago Downs Association,* 665 F.2d 781. Here GM decided not to sell cars when it learned they would be routed to K & R and then abroad. K & R does not allege that GM cancelled the order after encouraging K & R to take on contractual obligations; rather, it appears from the allegations that GM sought no involvement with K & R at any time.

K & R's allegations do not state a claim for tortious interference with contract.[8]

---

**8.** Because it is able to dismiss Count I based on K & R's pleadings alone, the court need not tackle the question of whether it may consider the documents submitted by K & R with its brief. Rule 12(b), Fed.R.Civ.P., permits the court to consider extrinsic evidence, but the

CONCLUSION

For the reasons stated above, the court grants GM's motion to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted. The case is dismissed.

It is so ordered.

court then must invite the parties to treat the motion as a full-scale summary judgment motion under Rule 56. Arguably the court would be free to use such extrinsic evidence against the party submitting it without calling for more papers. If these papers were considered the court might well find K & R estopped to complain of interference with its export contract, since the documents indicate that K & R informed GM that it had no such contract, and that the cars in fact would remain in the United States.