**In Re NEW MOTOR VEHICLES CANADIAN EXPORT ANTI-TRUST LITIGATION**

No. MDL 1532.

United States District Court, D. Maine.

March 4, 2004.

See, also, 307 F.Supp.2d 145, 2004 WL 414706.

Robert S. Frank, Harvey & Frank, Portland, ME, for Plaintiffs.

William J. Kayatta, Jr., Pierce Atwood, Portland, ME, for Defendants.

## MEMORANDUM DECISION AND ORDER ON DEFENDANTS' FED. R. CIV. P. 12(b)(6) MOTION TO DISMISS

HORNBY, District Judge.

Can retail purchasers and lessees of new vehicles sue manufacturers, distributors and dealers' associations for conspiring to prevent less expensive Canadian vehicles from entering the American market? The consumers claim that these defendants have thereby prevented a discount distribution channel from operating in the United States, causing new vehicle retail prices to rise to artificially high levels. The defendants move to dismiss, arguing that the consumers are indirect purchasers because they all bought from American dealers who are not defendants, and that they are therefore barred from recovery under the United States Supreme Court's holding in *Illinois Brick*. I conclude that retail purchasers and lessees are not barred from seeking injunctive relief, but are barred from recovering damages unless they join as named defendants the dealers from whom they purchased or leased and prove that those dealers joined in the conspiracy. I therefore **GRANT IN PART AND DENY IN PART** the defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss.

### I. FACTS ACCORDING TO THE AMENDED COMPLAINT [1]

The plaintiffs are consumers who have bought or leased new motor vehicles from American dealers in the United States since January 2001 ("the consumers"). They allege that American and Canadian motor vehicle manufacturers, distributors,

---

1. Because I am ruling on a motion to dismiss for failure to state a claim, I accept as true, for purposes of this ruling, all well-pleaded allegations in the Amended Complaint.

dealers (whom they have not sued) and dealers' associations entered into agreements to prevent emergence of a discount distribution channel in the United States. Amended Compl. ¶¶ 1, 6 (Docket Item # 32); Pls.' Mem. in Opp'n at 2 (Docket Item # 73). Apparently, particular brand models sell at retail in Canada for much less than in the United States, even after accounting for currency exchange rates. Amended Compl. ¶ 52. To halt the movement of these less expensive vehicles into the United States, manufacturers and distributors, with the help of dealers' associations, allegedly obtained agreement from American dealers not to honor warranties [2] or replace metric odometers with mileage odometers on vehicles purchased in Canada and brought into the United States. *Id.* ¶¶ 3, 5. They required Canadian dealers to agree not to sell to anyone who would take a new vehicle into the United States and imposed severe financial penalties for violating the requirement. *Id.* ¶¶ 4–5. The consumers argue that this conduct foreclosed a competitive discount distribution channel within the United States in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1997), and that new car prices thereby rose to or stayed at artificially high levels. *Id.* ¶ 1. They seek damages on a class-wide basis [3] and injunctive relief pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. *Id.* ¶¶ 1, 2, 7.

The remaining defendants are American Honda Motor Company, Inc.; Honda Canada, Inc.; BMW of North America, LLC; DaimlerChrysler Corporation; DaimlerChrysler Canada, Inc.; DaimlerChrysler Motors Co., LLC; Ford Motor Company; Ford Motor Company of Canada, Ltd.; General Motors Corporation; General Motors of Canada, Ltd.; Mercedes–Benz Canada, Inc.; Mercedes–Benz USA, LLC; Nissan North America, Inc.; and Toyota Motor Sales U.S.A., Inc., as well as the Canadian Automobile Dealers Association ("CADA") and the National Automobile Dealers Association ("NADA").

## II. Procedural Status

The Multi–District Panel has transferred 26 antitrust cases to this District for pretrial management. Parallel cases are pending in a number of state courts. Earlier, I ruled on the motion of certain Canadian defendants to dismiss for lack of personal jurisdiction. *In re New Motor Vehicle Canadian Export Antitrust Litig.,* Mem. Decision & Order on Defs.' Mot. to Dismiss for Lack of Personal Jurisdiction, MDL Docket No. 1532 (D.Me. Mar. 4, 2004). All defendants have moved to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. They argue that the plaintiffs are not entitled to relief in light of the United States Supreme Court's decision in *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

## III. Analysis

In *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 487–88, 491–92,

---

**2.** In my earlier ruling regarding personal jurisdiction, I referred to evidence indicating that it was the Canadian dealers who would not provide warranty coverage for vehicles exported from Canada. *See* Maier Aff., Exs. 15–16 (Docket Item # 75). This allegation is not made in the Amended Complaint. For the jurisdictional ruling I relied on properly supported affidavits and exhibits. *See Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675 (1st Cir.1992). For 12(b)(6) motions I must use only the allegations as stated in the complaint. (That is not to say that the allegation that American dealers would not honor warranties is unsupported. American dealers may have had at least the option not to honor Canadian warranties. Maier Aff., Ex. 15.)

**3.** A request for class certification is not yet ripe.

88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), the Supreme Court addressed the question whether a plaintiff could recover damages for an antitrust violation if it successfully passed on to its own customers the higher prices resulting from the violation. The answer was yes because the Court concluded that a contrary ruling would (1) place an unreasonable burden on the courts in future cases to determine whether and how much of the price increase had been passed on, and (2) reduce the incentives of private plaintiffs to sue. *See id.* at 493–94, 88 S.Ct. 2224.

Nine years later in *Illinois Brick*, 431 U.S. at 745–46, 97 S.Ct. 2061, the Court reaffirmed that direct purchasers are entitled to recover damages, but held additionally that *only* the direct purchasers can recover, and that their customers (indirect purchasers) are precluded from maintaining a damages claim for illegal overcharges passed down through the distribution chain. The Court adopted this "direct purchaser rule" to avoid the risks of multiple recovery (pursued by more than one level of purchaser), to keep courts from having to perform the complex task of apportioning damages between direct and indirect purchasers, and to focus enforcement of antitrust laws by concentrating the full recovery on direct purchasers. *Id.* at 730–31, 740–42, 746, 97 S.Ct. 2061.

Thirteen years after *Illinois Brick*, in *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207–08, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), the Court reaffirmed the vitality of the direct purchaser limitation. In *UtiliCorp*, the direct purchasers were public utilities that were *required* to pass on any cost increase, dollar for dollar, to their consumers. 497 U.S. at 208, 110 S.Ct. 2807. *See also In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir.1997). Nevertheless, the Court refused to allow the consumers to recover the passed on overcharges. It ruled that a blanket rule prohibiting indirect purchaser recovery was preferable so as to avoid difficult inquiries in each case, and that the direct purchaser rule serves "to eliminate the complications of apportioning overcharges between direct and indirect purchasers," and "to eliminate multiple recoveries." *UtiliCorp*, 497 U.S. at 208, 212–213, 110 S.Ct. 2807 (citing *Hanover Shoe*, 392 U.S. at 493, 88 S.Ct. 2224; *Illinois Brick*, 431 U.S. at 730–31, 740–42, 97 S.Ct. 2061). *See also* ABA Section on Antitrust Law, *Antitrust Law Developments* 857 (5th ed.2002) (citations omitted) (stating that the direct purchaser is the appropriate plaintiff in virtually every case).

### (A) The Claim for Damages under Illinois Brick

*Hanover Shoe, Illinois Brick* and *UtiliCorp* are the precedents against which I measure the consumers' claim in this case. I distill the following three theories of damage recovery from the Amended Complaint. But for the conspiracy, (1) existing American dealers would be able to purchase new motor vehicle models from Canadian dealers and resell or lease them in the United States at prices lower than those currently provided; (2) a hypothetical discount exporter/wholesaler would be able to purchase new motor vehicles from Canadian dealers and resell them in the United States to American consumers at prices lower than American dealers now offer; and (3) an American consumer would be able to travel to Canada and buy (for use in the United States) a new motor vehicle directly from a Canadian dealer at a price lower than in the United States. Amended Compl. ¶ 72. I conclude that (1) under the first theory consumers may be able to recover damages *but only if* they name as co-defendants the American dealers from whom they purchased and prove that those dealers joined the conspiracy;

(2) *Illinois Brick* bars the consumers from recovering damages under the second theory, the lost hypothetical discount distribution channel; (3) consumers may be able to recover damages under the third theory, *but only if* they name as co-defendants the Canadian dealers who refused to sell and prove that those dealers joined the conspiracy. (This third option may be impractical because of difficulties in establishing personal jurisdiction over such Canadian dealers.)[4]

■ *(1) American Dealers.* The consumers state that American dealers pay manufacturers 10–30% (after accounting for the exchange rate) more than Canadian dealers pay for the same vehicles. Amended Compl. ¶ 51. They argue that American dealers should be able to purchase new motor vehicle models from Canadian dealers at the lower Canadian price and resell or lease them to consumers in the United States at prices lower than current American prices. *Id.* ¶ 72. The manufacturers/distributors reply that the consumers are complaining about the pass-on of an overcharge, and that *Illinois Brick* generally prohibits recovery of pass-on overcharges by indirect purchasers like the consumers here. 431 U.S. at 737, 746, 97 S.Ct. 2061. Any injury and right to sue for damages, they say, lie only with the American dealers.

But the plaintiff consumers insist that there is no "overcharge" being "passed on." They accept the fact that there is a different price in Canada than there is in the United States. Their complaint is that manufacturers and distributors have conspired to stop American dealers from buying the less expensive vehicles from Canadian dealers and selling them in the United States. They claim that this is a

boycott, exempt from the limitations of *Illinois Brick*. Since the plaintiffs are masters of their pleadings, I accept their version of how to read their Amended Complaint. I do not accept their assertion that boycotts necessarily fall outside *Illinois Brick* principles. Plaintiffs alleging a boycott injury still seek a remedy under section 4 of the Clayton Act, just as the indirect purchasers did in *Illinois Brick*. I conclude that I must therefore measure the plaintiffs' requested damage recovery against the *Illinois Brick* line of cases.

In fact, there is a risk of duplicative recovery. Both the American dealers and the consumers are injured by the alleged antitrust violation, although their damage measures are arguably different. For the American dealers it is their lost profits/sales by being unable to buy and sell the cheaper Canadian models. For the consumers it is the higher price they paid at retail as compared to the price they would have paid if the Canadian vehicles were available (not the 10–30% differential, but an amount that would take into account the competitive effect of having those additional vehicles in the market, as well as transportation and other costs). Allowing such multiple damage measures expands the confusion, cost and possibility of error inherent in complex litigation. *See UtiliCorp*, 497 U.S. at 213, 110 S.Ct. 2807. The Supreme Court has stated its position quite clearly:

[t]he *Illinois Brick* rule also serves to eliminate multiple recoveries. The petitioners assert that no risk of multiple recovery would exist here, if we allowed them to sue, because the direct and indirect purchasers would be seeking different, not duplicative, damages; the peti-

---

**4.** The role of CADA and NADA (who do not sell or manufacture vehicles) does not affect the *Illinois Brick* analysis. This analysis depends on the underlying damages theories and who may assert damage claims, not on what additional parties may have also furthered the conspiracy.

tioners would recover the amount of the overcharge and the utilities would recover damages for their lost sales.... [W]e reject the argument in this case, just as we did in *Illinois Brick.*

*Id.* at 212–13, 110 S.Ct. 2807 (internal citation omitted).

There is only one way for the plaintiffs to avoid *Illinois Brick's* and *UtiliCorp's* prohibition of multiple recoveries, and that is to proceed in a way that ensures that there can be no multiple recoveries. The possibility of multiple recoveries exists so long as American dealers themselves can sue the manufacturers/distributors for the conspiracy. They can do so even if the dealers themselves were members of the conspiracy, *see Perma Life Mufflers, Inc. v. Int'l Parts Corp.,* 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), unless the dealers engaged in complete, voluntary and substantially equal participation in the conspiracy. *See Sullivan v. Nat'l Football League,* 34 F.3d 1091, 1107 (1st Cir.1994) (citations omitted). Because the dealers are not parties to this lawsuit, the possibility of inconsistent adjudications leaves the defendant manufacturers subject to the risk of liability that *Illinois Brick* found unacceptable.[5] *In re Beef Antitrust Litig.,*

600 F.2d 1148, 1163 (5th Cir.1979). What the plaintiffs need to establish is that the American dealers are jointly liable with the manufacturers/distributors for the antitrust conspiracy so that the dealers cannot recover against the manufacturers/distributors. They can do so only by joining the American dealers as defendants in this lawsuit and proving their liability.[6] *Id.* at 1163 (alleged co-conspirator middlemen must be named as parties defendant); *Brand Name,* 123 F.3d at 604 (plaintiffs must obtain judgment that wholesalers conspired with manufacturers); *Technical Learning Collective, Inc. v. Daimler–Benz Aktiengellschaft,* 1980 WL 1943, *9, 1980 U.S. Dist. LEXIS 9517, *21–22 (D.Md. 1980) (alleged co-conspirator middlemen must be named as parties defendant); *accord Campos v. Ticketmaster Corp.,* 140 F.3d 1166, 1171 n. 4 (8th Cir.1998) (requiring direct purchaser co-conspirators to be joined as defendants); *Link v. Mercedes–Benz of North Am., Inc.,* 788 F.2d 918, 933 (3d Cir.1986) (same).

The consumers would then have proven that they are direct victims of a conspiracy between dealers and manufacturers/distributors without risk of multiple recovery.[7] *Brand Name,* 123 F.3d at 604.

---

**5.** In a separate lawsuit brought by the dealers, the manufacturers could not use a judgment or finding of a vertical conspiracy in this case to prevent the dealers from successfully asserting in the separate lawsuit that they did not in fact conspire with the manufacturers, and are therefore not barred by the co-conspirator doctrine from recovering damages from the manufacturers. *In re Beef Antitrust Litig.,* 600 F.2d 1148, 1163 (5th Cir. 1979) (citation omitted).

**6.** The plaintiffs cite a number of cases that did not require joinder of the co-conspirator, but all these cases were decided well before the *UtiliCorp* decision. *See* Pls.' Mem. in Opp'n at 11 & n. 7 (citing *Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478, 481 (7th Cir.1980)); *Nat'l Wrestling Alliance v. Myers,* 325 F.2d 768, 775 (8th Cir.1963); *Abrams v.*

*Interco, Inc.,* 1980 WL 1822, 1980–2 Trade Cas. (CCH) ¶ 63,292, at 75,552 (S.D.N.Y. 1980); *Vermont v. Densmore Brick Co.,* 1980 WL 1846, 1980–2 Trade Cas. (CCH) ¶ 63347, at 75778 (D.Vt.1980); *Gas–A–Tron of Arizona v. Am. Oil Co.,* 1977 WL 1519, 1977–2 Trade Cas. (CCH) ¶ 61789, at 73,245 (D.Ariz.1977).

**7.** Obviously I leave to the plaintiffs determination of how properly to join the dealers as named defendants. I recognize the complexities in joining a large number of defendants or, as suggested at oral argument, creating a defendant class. Commentators have wondered: "Can the existence of a conspiracy be proven in a single proceeding representing the entire defendant class, or does proof of a conspiracy depend upon proving each defendant's participation in the alleged conspiracy, an inherently individual question that must be

142

**■ (2) The Discount Distribution Channel.** The consumers allege that the defendants also foreclosed an exporter/wholesaler discount distribution channel (*i.e.,* hypothetical companies that would buy motor vehicles in Canada at the lower prices and sell or lease them to consumers in the United States). *See* Amended Compl. ¶ 72. But under this discount distribution channel theory both the Canadian dealers who lost those sales and the hypothetical discount dealers who were foreclosed from entering the market also suffered damages in addition to the consumers. *Cf. K & R Leasing Corp. v. General Motors Corp.,* 551 F.Supp. 842, 845 n. 3 (N.D.Ill.1982). Does *Illinois Brick* bar recovery to the consumers under this damages theory?

The measure of damages to these direct purchasers (the hypothetical discounters and the Canadian dealers) certainly differs from the measure of damages to the consumers. For the former, it is the lost profits/sales suffered by the discounters and the Canadian dealers who were victimized by the boycott, whereas for consumers it is the price differential consumers had to pay at retail. Unfortunately for the plaintiff consumers, that difference is not enough to avoid the rule of *Illinois Brick,* which bars the recovery of duplicative damages as I have already described. *See UtiliCorp,* 497 U.S. at 212, 110 S.Ct. 2807 (citing *Illinois Brick,* 431 U.S. at 730–31, 97 S.Ct. 2061).

Moreover, the consumers' claims for damages are barred completely under their lost discount distribution theory channel because, unlike in the previous American dealer analysis, it is impossible for the consumers to join all the necessary parties. The Canadian dealers perhaps could be joined as defendants (there may

be personal jurisdiction obstacles), but by definition the hypothetical discount dealers were never party to the conspiracy and therefore cannot be joined as defendants. Thus, even if the plaintiff consumers were successful in naming the Canadian dealers as defendants, the dangers of multiple recovery would still exist because potential discounters could emerge later with a damages claim against the manufacturers/distributors.

**■ (3) American Consumers Buying in Canada.** The plaintiff consumers also allege that, but for the conspiracy, American consumers would be able to buy new motor vehicles directly from Canadian dealers and bring them into the United States. These consumers, they say, are direct purchaser victims of a conspiracy without the usual *Illinois Brick* problem because, as against the unwilling-to-sell Canadian dealers, they are challenging a vertical restraint or refusal to deal. They seek damages resulting from that boycott, rather than the pass-on of an overcharge by the American dealer from whom they ultimately purchased, the primary concern of *Illinois Brick.* But the Canadian dealers may also have a cause of action against the Canadian manufacturers and distributors for prohibiting such sales. These Canadian dealers might have wanted to increase their sales by selling to the American consumers and they may have lost sales because of the manufacturers'/distributors' restrictions. Although the consumers' measure of damages is different (the price difference between the American and Canadian vehicle models, less travel and other expenses), it is nevertheless duplicative within the meaning of *UtiliCorp.*

As with the American dealers, the problem can be avoided only by naming the

answered separately for each defendant?" Robert E. Holo, Comment, *Defendant Class Actions: The Failure of Rule 23 and a Pro-*

posed *Solution,* 38 U.C.L.A. L.Rev. 223, 258 (1990).

Canadian dealers as defendants in this lawsuit and proving their liability. *See Beef,* 600 F.2d at 1163; *Brand Name,* 123 F.3d at 604; *Campos,* 140 F.3d at 1171 n. 4; *Technical Learning,* 1980 WL 1943 at \*9, 1980 U.S. Dist. LEXIS 9517 at \*21–22; *Link,* 788 F.2d at 933.

### (B) The Ownership or Control Exception to Illinois Brick

■ *Illinois Brick* has a so-called ownership or control exception. In a footnote, the Supreme Court suggested that an indirect purchaser might be permitted to recover damages if the direct purchaser (here, a dealer) is owned or controlled by the seller (here, the manufacturer or distributor).[8] *See Illinois Brick,* 431 U.S. at 731 n. 16, 97 S.Ct. 2061 (citing *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 199 (1973)). But I agree with the appellate caselaw that limits this exception to "relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has only been one sale." *Jewish Hosp. Ass'n v. Stewart Mech. Enters., Inc.,* 628 F.2d 971, 975 (6th Cir.1980) (citing *Beef,* 600 F.2d at 1162). That is the only way to be faithful to both *Illinois Brick* and *Utili-Corp.*

■ The consumers make four arguments in their attempt to meet the ownership or control exception of *Illinois Brick:* (1) authorized dealers are agents of the manufacturing defendants acting within the course and scope of that agency; (2) dealers are subject to the terms of their "franchise dealer agreements;" (3) manufacturers impose a chargeback system on dealers; and (4) vehicle pricing is a form of control. Pls.' Mem. in Opp'n at 12–15 (citing Amended Compl. ¶¶ 44, 50–52).

None of these assertions shows that the manufacturers or distributors control the dealers "through interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock," *Brand Name,* 123 F.3d at 605–06 (citing *Jewish Hosp.,* 628 F.2d at 975; *Gould v. Ruefenacht,* 471 U.S. 701, 705, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985)). The plaintiffs have alleged nothing that demonstrates that the dealers function as anything other than independent economic entities in the chain of distribution. *See In re Mercedes–Benz Anti–Trust Litig.,* 157 F.Supp.2d 355, 366 (D.N.J.2001). There is no suggestion that the dealers fail to take title to the vehicles or to deal with the plaintiffs in the role of seller to consumer. *See id.* It may be true that dealers make financial agreements with manufacturers to help buy vehicles or establish dealerships, that manufacturers force chargeback penalties on dealers, that vehicles are priced on the basis of manufacturers' suggestions, and that dealers may have a contractual agency agreement to sell vehicles. But none of these factual assertions shows that manufacturers/distributors control dealers to such a degree that collectively they function as a unitary entity on the distribution chain. On their pleadings, the plaintiffs do not satisfy the control exception to *Illinois Brick.*[9]

---

8. Thus, there would be no pass-on overcharge, and there would be no danger of multiple recoveries because the seller would ensure that the direct purchaser did not file suit.

9. In the alternative, the plaintiffs request discovery on this issue. I **DENY** this request. The plaintiffs have shown no basis for concluding that additional discovery would yield

### (C) Injunctive Relief

■ *Hanover Shoe, Illinois Brick* and *UtiliCorp* apply only to damages. *Beef,* 600 F.2d at 1167 ("[T]he *Illinois Brick* rule has no application to claims for injunctive relief."); *accord Campos,* 140 F.3d at 1172. Therefore, indirect purchaser status does not bar the plaintiffs from seeking injunctive relief under section 16 of the Clayton Act. *Illinois Brick*'s direct purchaser rule arises from the complexities of determining what part of the overcharge will be borne by the direct purchaser and what part will be borne by the indirect purchaser, "complexities that do not arise when the courts must consider the propriety of injunctive relief." *Campos,* 140 F.3d at 1170, 1172. As Professors Areeda and Hovenkamp explain,

> An equity suit neither threatens duplicative recoveries nor requires complex tracing through the distribution chain. There are no damages to be traced, and a defendant can comply with several identical injunctions as readily as with one. *Illinois Brick* has not therefore barred an indirect purchaser's suit for an injunction.

Areeda & Hovenkamp, II *Antitrust Law* ¶ 346d, at 364. *See also Campos,* 140 F.3d at 1172 (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 371d, at 259 (1995)). I conclude that the plaintiffs therefore can maintain all their claims for injunctive relief. Indeed, to conclude otherwise might leave the consumers with an irreparable injury: if hypothetical discount dealers choose not to sue, or American and Canadian dealers are involuntary participants in the distribution scheme yet choose not to

bring a lawsuit, these consumers (who may be unable to recover damages) would be left completely without a remedy against continuing illegal activity.[10] I therefore **DENY** defendants' motion to dismiss for failure to state a claim as to injunctive relief.

### IV. CONCLUSION

The 12(b)(6) motion to dismiss of the defendants is **GRANTED IN PART AND DENIED IN PART.**

The plaintiffs' claims seeking injunctive relief shall proceed in full.

The plaintiffs are barred from damage recovery on the theory of a lost discount distribution channel.

The plaintiffs may seek damages against manufacturers and distributors who conspired to prohibit American dealers from buying Canadian vehicles and selling them in the United States, *but only if* they properly join as named defendants those American dealers and ultimately establish their liability as well. The plaintiffs have sixty (60) days to amend their complaint joining American dealers as defendants if they still wish to proceed on this theory for money damages.

The plaintiffs may seek damages against manufacturers and distributors who conspired to prohibit Canadian dealers from selling to American consumers *but only if* they properly join as named defendants Canadian dealers who would refuse to deal with them and ultimately prove their liability as well. If the plaintiffs wish to proceed on this theory for money damages, they have sixty (60) days to amend their

---

information sufficient to warrant the disregard of the sale to the dealer.

**10.** The defendants argue that the Amended Complaint does not allege irreparable injury. It does, however, allege that "violations are continuous and will continue unless enjoined

by this Court." Amended Compl. ¶ 90. It would be pointless to require a new amendment to add the specific allegation. Indeed, the most persuasive basis for a finding of irreparable injury is the defendants' success in pursuing this motion, something that happened after the Amended Complaint was filed.

complaint joining Canadian dealers as defendants.

So ORDERED.